# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **FLOYD SESSON, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-01165** |
| | ) | **Judge Aleta A. Trauger** |
| **UNITED PARCEL SERVICE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 63) filed by defendant United Parcel Service, Inc. ("UPS"), seeking judgment in its favor on plaintiff Floyd Sesson, Jr.'s claims for race discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* For the reasons set forth herein, the motion will be granted in its entirety.

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.      FACTS AND PROCEDURAL HISTORY

Floyd Sesson is as an African American male who has been employed by defendant UPS, the world's largest package delivery company, since November 1989. Sesson initiated this lawsuit on December 27, 2019 with the filing of a *pro se* Complaint asserting claims for race discrimination and retaliation based on events that took place from November 2016 through May 2017. (Doc. No. 1, at 4.)[1] Sesson filed his first Amended Complaint in January 2020 and, in response to a Motion to Dismiss or, in the Alternative, Motion for More Definite Statement (Doc. No. 10), filed his Second Amended Complaint in February 2020. (Doc. Nos. 6, 19.) The latter

---

[1] He also attached to his Complaint copies of the complaint he filed with the Equal Employment Opportunity Commission ("EEOC") on May 16, 2017 and the EEOC's September 28, 2019 Notice of Rights letter. (Doc. No. 1-1.)

included allegations that discriminatory actions took place from December 2015 through December 2019 and that the plaintiff believed the defendant was "still committing these acts against [him]." (Doc. No. 19, at 4.) In March 2020, an attorney entered an appearance on behalf of Sesson and filed a Third Amended Complaint. (Doc. Nos. 23, 32.) In July 2020, the plaintiff, through counsel, sought and was granted leave to file a Fourth Amended Complaint. The Fourth Amended Complaint ("FAC") (Doc. No. 43) is now the operative pleading in this action.

The FAC states claims for employment discrimination based on race, racial harassment/hostile work environment, and retaliation in violation of Title VII. As set forth in the FAC, in addition to the May 16, 2017 EEOC Complaint referenced above (Doc. No. 1-1), the plaintiff filed separate discrimination complaints with both the Tennessee Human Rights Commission ("THRC") and the EEOC on October 25, 2017 and November 27, 2018 (Doc. Nos. 32-1 (THRC Oct. 27, 2017 Complaint); 32-2 (Nov. 27, 2018 THRC Complaint)), and a Complaint with the THRC and EEOC on February 14, 2020, alleging retaliation (Doc. No. 43-1).

The defendant has filed a Motion for Summary Judgment, supporting Memorandum of Law, Statement of Undisputed Material Facts, and various evidentiary materials, seeking dismissal of all of the plaintiff's claims. (Doc. Nos. 63, 64, 64-1 through -12, 65.) The plaintiff filed a Response in opposition to the Motion for Summary Judgment, Response to the Statement of Undisputed Material Facts, his own "Additional Statement of Material Facts," and additional evidentiary materials. (Doc. Nos. 66, 67, 68-1 through 8, 69.) UPS filed a Reply brief and Response to the plaintiff's Statement of Additional Material Facts. (Doc. Nos. 72, 73.)

The material facts, gleaned from the parties' filings and viewed in the light most favorable to the plaintiff, are as follows.[2]

---

[2] If a fact set forth herein is both undisputed and does not contain a direct quotation, it is

UPS characterizes itself as an equal opportunity employer and has adopted official policies expressly prohibiting discrimination based on race or any other protected characteristic and prohibiting retaliation for employee complaints made in good faith. (Doc. No. 64-1, at 5, 8 (UPS Policy Book excerpts).) According to the Policy Book, UPS "encourage[s] employees to ask questions or voice their opinions" and, "[i]n some cases, [it] require[s] employees to report a concern about an actual, perceived, or potential violation of our legal or ethical responsibilities." (*Id.* at 7.) The Policy Book outlines available options for employees to "communicate their concerns." (*Id.* at 7–8) Pursuant to official policy, UPS "strive[s] to anticipate and promptly eliminate causes of concern" and "keep[s] the employee informed about the status of his or her concern." (*Id.* at 8.)

As set forth above, Sesson began his employment with UPS in 1989. At all relevant times, he has worked at UPS's Whites Creek facility in Nashville, Tennessee as an automotive technician. He is a member of the International Brotherhood of Teamsters ("union"). For most of the time relevant to this dispute, the plaintiff held a parts position rather than a mechanic position. (Doc. No. 68-1, Sesson Dep. 25[3] ("Q: So there's only one position on the bid sheet for parts, and that's the position that you're in? A: Right.").) As the plaintiff explained, other mechanics "worked on parts," but he was the "only one that held that position on the bid sheet." (*Id.* at 174.) In that position, Sesson had three primary job responsibilities: parts, receiving, and inventory input. (*Id.* at 177.) The bid process was governed by seniority, and Sesson was "the most senior mechanic at the location." (*Id.* at 35.) The bid process recurs every six months. (*Id.*)

---

drawn from one or the other party's response to the other party's factual statement, Doc. No. 66 or 72.

[3] The deposition transcripts in the record are in condensed form, with four transcript pages per document page. The court will refer to them initially by referencing the docket number and thereafter by the original transcript's pagination.

Beginning in November 2015, Sesson's direct supervisor was Automotive Fleet Supervisor Shad Boots. From January 2015 through September or October 2018, the plaintiff's Automotive Fleet Manager was Ronnie Price. Price was Boots's direct manager.

In August 2016, Sesson told Ronnie Price that he was tentatively scheduled for knee replacement surgery in September 2016. Price "made light" of Sesson's need for knee surgery. (Doc. No. 68-4, Phelan Dep. 77.) The scheduling of the plaintiff's knee replacement surgery was being coordinated by a workers' compensation case manager at Liberty Mutual, the insurance company that served as UPS's third-party administrator for workers' compensation claims and that administered the plaintiff's workers' compensation benefits. Although the plaintiff alleges in the FAC that his knee replacement surgery was "cancelled as a result of the actions of Mr. Price and management at UPS" (Doc. No. 43 ¶ 16), the plaintiff now concedes, at least for purposes of the defendant's Motion for Summary Judgment, that neither Price nor any other UPS employee spoke to any Liberty Mutual employee about the scheduling of Sesson's knee replacement surgery. (Doc. No. 66, Resp. to ¶ 66.) Instead, it was the Liberty Mutual case manager who never finalized a date for the plaintiff's requested knee replacement surgery, which is the sole reason the plaintiff did not undergo knee replacement surgery as scheduled.

In September 2016, Sesson complained to Price that another automotive technician, Jay Satler (a White male), was placing equipment in the entryway of the garage door, preventing the plaintiff and others from using a tow motor to transport automotive parts through the garage door. The plaintiff did not mention race as a factor when he complained to Price about Satler's conduct.[4]

---

[4] The plaintiff purports to dispute this fact, citing Price's deposition testimony in which he recalled one instance in which the plaintiff made a reference to his own skin color and implied that Price was biased against him. (Doc. No. 68-7, Price Dep. 52.) Price did not recall the context of that conversation or when it occurred. (*Id.* at 53–54.) Other evidence in the record suggests it took place in December 2016. (*See* Price Dep. 77.) The plaintiff does not point to any evidence that he

Price testified that, in response to such a complaint, he would have "definitely got Shad [Boots] involved and have him take care of" the problem, because Boots was the direct supervisor, and Price believed that Boots "resolved it." (Price Dep. 70.) Kevin Phelan, a White automotive technician with whom Sesson worked, testified that when Sesson complained about Satler, management would "say something" to Satler, but after a few days Satler would go back to the same behavior. (Phelan Dep. 42.) When the problem recurred, at some later date, Sesson and Phelan together approached Price and Boots to complain about Satler. Price and Boots again instructed Satler to stop leaving his equipment in a manner that would block the entryway. After Phelan and Sesson complained together, management may have taken the complaint more seriously, but Satler was never disciplined. (*Id.* at 44, 45, 53.)[5]

In November 2016, Sesson injured his shoulder while on the job. Due to his injury, he was placed on light duty for 29 days. Following his placement on light duty work, the plaintiff took disability leave and was off work for approximately the first eight months of 2017. In May 2017, while on leave, the plaintiff filed a Charge of Discrimination with the EEOC and the THRC alleging race discrimination and retaliation stemming from his issues with Satler's placement of equipment in front of the garage door. (*See* Doc. No. 1-1, at 2.)

In the FAC, the plaintiff complains that a co-worker, Robert Baltz, who is White, also suffered an on-the-job injury. Baltz, instead of being placed on light duty work, was placed on

---

ever claimed (to Price or anyone else) that *Satler's* conduct was racially motivated. Instead, he now points to a White co-worker's testimony that "for some period of time," Satler had a Confederate flag sticker on his toolbox. (Phelan Dep. 61.) There is no evidence in the record, however, that Sesson saw that sticker, was aware that it was there, or complained about it.

[5] In the FAC, the plaintiff states that Price did nothing after the plaintiff complained, but when Phelan (alone) complained to Price about Satler's blocking the doorway, Price immediately "ordered Shad Boots to take corrective action and have Satler clear the blocked doorway," which Boots did. (FAC ¶ 23.) The actual evidence in the record does not support this version of events.

disability leave immediately and received workers' compensation benefits within fourteen days of going on leave, while the plaintiff's receipt of workers' compensation benefits was delayed until the end of his leave. The plaintiff appears to have abandoned a claim of discrimination based on the supposedly preferential treatment that Baltz received.[6]

At some point in 2017, apparently while the plaintiff was on disability leave, UPS moved its Whites Creek operations to a new building. Upon his arrival at the new building following his disability leave, Sesson returned to his position in the Parts Department. Sesson alleges in the FAC that UPS engaged in a "pattern and practice of harassment and intimidation" based on race, including by, among other things, "[f]requently changing [the] start time for [the plaintiff's eight-hour shift] more often" than it changed the start times for White employees' shift start times. (FAC ¶ 27(b).)

Regarding shift start times, Shad Boots testified that, after they moved to the new building, the parts position shift start time changed from 6:00 to 7:00 a.m., and perhaps to 8:00 at some point. (Doc. No. 68-6, Boots Dep. 44.) In addition, he recalled that Price "wanted to try a 12:00 start," but that "didn't work out very good." (*Id.* at 44–45.) According to Boots, the changing start times were related to the fact that, at the new facility, they "weren't getting [the] parts deliveries until between 11 and 12 most days. So . . . [Price's] thought was, well, there's no reason to have a parts guy here at 6:00 or 7:00 or 8:00 in the morning if he has nothing to put away or do until his parts got there." (*Id.* at 45.) But later they "realized that . . . [the parts guy] had other things he could be doing so they moved it back to 8:00." (*Id.*) Price testified that he recalled that the

---

[6] It is now undisputed that Baltz suffered severe injuries that resulted in his being transported to the hospital by Shad Boots. It is also undisputed that UPS does not administer workers' compensation claims or benefits. Third-party insurer Liberty Mutual processes and administers workers' compensation claims, benefits, and covered medical treatment.

managers, including Shad Boots and two others, wanted to move the start time for the parts position and that the four of them would have had a meeting to discuss the issue. (Price Dep. 89.) Price did not recall the start time being pushed back later than 8:00 or 9:00, but he recalled the rationale as being that a later start time made sense because the parts were being delivered later. (*Id.* at 88–89.)

The plaintiff maintains that the changing start time was somehow discriminatory or harassing. He points to the deposition testimony of his colleague Steve Calvert, a White male. Calvert testified that, in his opinion, Price "really had something against" Sesson, and he believed that it was "because of his color." (Doc. No. 68-3, Calvert Dep. 23.) This belief was based on Price's decision to "take the parts bid away" from Sesson by moving the shift start times. He also claimed to have overheard Price discussing with a group of mechanics "how can I change this bid so Floyd [Sesson] won't take it. And they moved it to several different times, and I think they even moved it as late as noontime one time, trying to get him not to take the bid." (*Id.* at 24.) Calvert also believed that "the whole time [Sesson] was the parts guy," the shift start time "kept moving . . . around," but, as soon as Sesson went out on leave, Kevin Phelan, who is White, was allowed to bid the shift as starting at 6:00. (*Id.* at 24–25.)

Phelan testified that he believed the changing start time would have negatively affected Sesson's ability to do his job. (*See* Phelan Dep. 29 ("Yes. I think so. My ability, his ability, anybody that's working that job would be affected by a later start time.").) Sesson himself, however, testified that he continued to bid the parts position when the start time changed to 7:00 a.m. When the position changed to a 9:00 a.m. start time, he did not bid the position. Instead, he took a position as a fleet mechanic with a 6:00 a.m. start time for a period of time. (Sesson Dep. 40.) When the parts position start time changed to 10:00 a.m. and then to noon, he took those bids. (*Id.* at 41.) The start time eventually moved to 8:00 a.m. and has stayed there, and Sesson has continued to

bid the position. (*Id.* at 42.) There is no evidence in the record that Sesson believed that his ability to do the job was affected by the start times, nor is there any objective evidence in the record to substantiate Phelan's belief that it would. Sesson stated only that he had held the parts position "off and on" for about fifteen years and that, occasionally, when the position as posted "conflicted with something else [he] did outside of work," he would not bid for that job. (*Id.* at 42–43.)

In the FAC, the plaintiff complained about UPS's hiring a "new employee" to "replace Plaintiff in the Parts Department" in December 2017. (FAC ¶ 28.) The deposition testimony regarding this event is that Price, together with regional management and union officials, decided in late 2017 that UPS needed a "specialized parts person" to staff the Parts Department. Price ultimately chose Kyle Roehl, a 30-year-old White male, whom Price believed to have significant experience in inventory management, to assume responsibility for the Parts Department. Shad Boots testified that he understood, based on what Price told him, that Roehl was "basically going to take over Mr. Sesson's job in the parts department[]." (Boots Dep. 48-49.) However, Roehl ultimately was in the position for less than a month. (*Id.* at 50.)

Price recalled "hiring a new employee and putting [him] in the job in the parts department instead of Floyd Sesson." (Price Dep. 91.) He explained that he had seen how other UPS facilities operated with a "parts person, . . . a specific parts person that specializes in today's parts system." (*Id.* at 91–92.) He discussed the matter with "all of management, labor management, everybody," and together they "made a business decision that we were going to put a specialized parts person in that position." (*Id.* at 92.) Ultimately, they hired someone who was "very computer savvy," "ran inventory controls," and "was specifically for parts . . . and kept up with all the technology." (*Id.*) Initially, everyone was on board, including both union managers and UPS managers, but, ultimately, the union changed its mind at the "11th hour" and decided it would not support

changing the designation of the position from one bid by a mechanic, as had always been done at the Whites Creek facility. (*Id.* at 93–94.) If they had followed through with this change, it would have meant that Sesson would no longer have been able to bid for the parts position. According to Price, Sesson would have gone back to "working on the fleet," which, again according to Price, "would have probably been good for everybody because . . . he's a very good technician." (*Id.*) In any event, it is undisputed for purposes of the Motion for Summary Judgment that Roehl was terminated from the parts position in January 2018, shortly after he was hired, and Sesson was never reassigned to a different position or prevented from bidding for the parts position.

Sesson filed internal grievances from November 2018 until February 2021 related to not being allowed to work overtime. (Sesson Dep. 67.) In February 2021, UPS began allowing him to work overtime in the Parts Department again. (*Id.* at 68.) The evidence in the record regarding overtime is that, in November 2018, Duane Holmquest became Automotive Fleet Manager (after Ronnie Price was fired in September 2018). On November 27, 2018, Holmquest emailed automotive supervisors about a directive from District Manager Chris Crawford to "cut costs drastically if at all possible" by, among other things, cutting "[a]ll overtime . . . unless it is to complete a vehicle to keep it from being red tagged." (Doc. No. 64-8, at 2.) Holmquest noted that all overtime needed to be approved by a manager, and Holmquest "need[ed] to know who, what, where and why so I can explain it to Chris [Crawford]." (Doc. No. 64-8, at 2.) The November 27 email included a list of over fifty technicians by name (including Sesson)[7] and identified dates on which they had worked overtime and how much. (*Id.* at 2–3.) A follow-up email from Holmquest on December 5, 2018 stated only, "Please make sure this is very clear with all your techs. Absolutely ZERO overtime on parts." (*Id.* at 4.) On the same day, Holmquest emailed a supervisor

---

[7] All names except Sesson's are redacted on the exhibit.

identified only as "Barry," again emphasizing that the supervisor needed to make sure "no techs have overtime doing parts" and asking whether he had authorized "Phillip" to work overtime stocking parts. (*Id.* at 5.) Holmquest sent another email on December 26, 2018, again emphasizing the directive. (*Id.* at 6.) Sesson testified that Holmquest told him in November 2018 that Chris Crawford told him to tell Sesson that he "can't work overtime in parts." (Sesson Dep. 89.) Sesson also testified that, "during the 30 years" he had been there, he had "always worked in parts on overtime," "because it was the only way you could get it all done." (*Id.* at 91–92.) Sesson acknowledged that District Manager Chris Crawford was the person who issued the "no overtime" directive. (*Id.* at 92–93.) As of the date of his deposition, Sesson was back to being permitted to work overtime in parts. (*Id.* at 94.)

Sesson disputes UPS's assertion that, for some period of time, the plaintiff and all other automotive technicians were prohibited from working overtime in the Parts Department by pointing to the deposition testimony of Kevin Phelan, Phillip Gallucci, and Steve Calvert, claiming that management allowed other employees but not Sesson to work overtime. Sesson's and these other witnesses' testimony shows, however, that Sesson was allowed to work overtime if he was working on trucks, but not if he was working strictly in the Parts Department. (*See* Sesson Dep. 167–68; Phelan Dep. 32 (testifying that Sesson told him that he "was not allowed to work any overtime in the parts room. That he could work overtime if he was working on brown trucks . . . ."); Doc. No. 68-5, Gallucci Dep. 30–31 (testifying that Sesson was not allowed to work overtime in the Parts Department but that Gallucci and other mechanics were "allowed to work overtime to maintain our fleets because that's our job that we signed on the bid"); Calvert Dep. 32–33 ("[T]hey wouldn't let [Sesson] work overtime in parts. . . . They were telling him he couldn't work overtime on his bid job, that he had to go work on a brown truck.").) According to Calvert, Sesson was the

Parts Department, so the directive that no one work overtime on parts only affected him. (*See* Calvert Dep. 34 ("[T]he only person working parts was Floyd Sesson. His name was on the part bid.").)

The FAC also alleged that the plaintiff was required to undergo drug screenings "with greater frequency than other similarly situated Caucasian employees." (FAC ¶ 27(c).) In his deposition, however, he testified that he was tested more frequently than *any* other employees, Black or White, and he affirmatively denied any intent to "insinuate[e]" that he was tested more frequently because of his race. (Sesson Dep. 124–25.) In his Response to the defendant's Statement of Undisputed Material Facts, Sesson concedes that UPS employs a random drug testing policy pursuant to which employees are randomly chosen to take a drug test. (Doc. No. 66, Resp. ¶ 43.)

In the FAC, the plaintiff alleges in support of his harassment claim that he was "[f]requently lock[ed] . . . out of his work computer and den[ied] . . . access to his computer, which unnecessarily caused [him] to suffer poor job performance and complaints against him at UPS." (Doc. No. 43 ¶ 27(d).) In his deposition, he conceded that he did not know whether or how frequently other employees, Black or White, experienced the same problem, and he only recalled one instance when he was "locked out" of his computer, when the screen would "go black" when he attempted to log in, preventing him from checking the status of a parts order. (Sesson Dep. 163, 167.) He blamed the event on Ronnie Price, because, when he notified Automotive Fleet Supervisor Barry York about the issue, York "went upstairs, met with Price, came back, told me it's now working." (Sesson Dep. 163.) He agreed that this "doesn't mean Price told him to lock you out. It may have just been the system [was] down." (*Id.*) He also acknowledged that computers "don't always operate perfectly." (*Id.* at 163–64.)

The FAC alleges that Ronnie Price harassed the plaintiff by "[s]tanding in Plaintiff's work area and staring at him in an angry, menacing, and intimidating manner." (Doc. No. 43 ¶ 27(e).) In his deposition, the plaintiff testified that this only happened on one occasion, and he did not recall when. (Sesson Dep. 112.) He testified that, "if looks could kill," this one would have, but he also conceded that Price did not speak to him or touch him on that occasion, threateningly or otherwise. (*Id.*)

On October 31, 2019, Kam Sandstrom, a trainer at the Whites Creek facility, approached Sesson to train him on methods and procedures for parts receiving, tracking of inventory, inventory documentation, and core parts returns. The plaintiff testified that he asked Sandstrom what the training was. (Sesson Dep. 133.) When Sandstrom did not answer, the plaintiff told him "we're not doing it this day." (*Id.* at 134.) Sandstrom said, "We are or else." (*Id.*) Sesson told him he would not take the training and that Sandstrom should not "come over here to harass [him] again." (*Id.*) The plaintiff also told Sandstrom that he was going to clock out early for lunch and go to the local police precinct to file a complaint against him. (*Id.* at 132–33, 14.) When Sesson returned to the facility at 5:00, Sandstrom told him he could "stay and get [his] eight hours" if he wanted to, meaning the eight hours of training, but the plaintiff went home instead. (*Id.* at 133, 148–49.) The plaintiff's position is that Sandstrom did not have anything new to show him that he had not already shown him "two or three times over the years." (*Id.* at 135.)

On November 4, 2019, Sandstrom and Jason Jeanis, a union representative, conducted a disciplinary meeting with the plaintiff to discuss his refusal to follow Sandstrom's directions. Following the meeting, UPS issued Sesson two written warnings that a repetition of his insubordination would result in the termination of his employment as well as a written notice of UPS's intent to suspend him for insubordination. UPS, however, ultimately did not suspend or

terminate Sesson. According to Sesson, Sandstrom admitted during the meeting with the union representative that he did not have any new training material to offer, so the meeting was adjourned and no disciplinary action was taken.

The plaintiff filed his *pro se* Complaint on December 27, 2019. In the FAC, the plaintiff alleges that, on January 6, 2020, just days after he filed the original Complaint, UPS installed a surveillance camera directly over the plaintiff's desk in the Parts Department to retaliate against him for filing his race discrimination case. (FAC ¶¶ 39–40.) There is no dispute, however, that the Whites Creek facility contains security cameras throughout the building. The facility's management installed three new cameras in or around January 2020, including one in the Parts Department where Sesson worked, one in the "upstairs storage area for parts" where vending machines are located, and one in the employee breakroom. (Boots Dep. 56.) The plaintiff agreed that parts are expensive, and the company did not "want anybody walking away with them." (Sesson Dep. 12.) Boots testified that there were now two "centrally located cameras in the shop on each side of the shop. . . . [T]he one side the camera covers very well. And then on the side that Mr. [Sesson's] area is on, we added that second one . . . to get rid of some blind spots in that area." (Boots Dep. 57.) The plaintiff has never actually seen any recording of himself on the Parts Department cameras. (Sesson Dep. 120.)

In further support of his harassment/hostile work environment claims, the plaintiff cites to the deposition testimony of several colleagues. Fred Summers, who is Black, is a Class A automotive technician for UPS. (Doc. No. 68-2, Summers Dep. 10.) Summers testified that Ronnie Price gave "special privileges" to the "white guys" in the shop at the Whites Creek facility. (*Id.* at 15.) Summers felt that Price disciplined Black employees and White employees differently and that "whites got more favoritism than blacks did." (*Id.* at 15, 17.) As an example of this, he claimed

that, if a job came into the shop that he did his best to troubleshoot before going to Ronnie Price or Barry York to tell them he believed the job "needs to go out to be serviced," they would refuse, but if a White employee made the same request, "it automatically goes out." (*Id.* at 19; *see id.* ("Any issue of the jobs they had there that they couldn't repair or they chose not to repair, it went to the outside service. My job stayed in the house, same jobs. So that's why I felt like that was discrimination.").) Summers never heard Barry York or Ronnie Price use racially charged language, but he believed that they were both racist. (*Id.* at 20, 26, 31.)

Steve Calvert, who is White, testified that he believed that Price's "actions show that he didn't like the black people in the shop." (Calvert Dep. 14.) He "observed [Price] disciplining the black people different than the white people." (*Id.* at 15.) If a White mechanic did something incorrectly, "it would just be ignored," but if a Black mechanic did the same thing "it would be a bid deal. He would have them written up or . . . try to give them a warning letter. There was just a double standard in discipline." (*Id.* at 15–16.) He did not offer a specific example of this practice, however. Calvert claimed that he himself was "kind of singled out" because he refused to conform to "the environment that the people in the shop wanted," which he characterized as "a hostile and racial environment." (*Id.* at 19.) At some point, Calvert filed a complaint with HR about Price's having "a different set of rules for black and white individuals," but the complaint was actually about disciplinary treatment that Calvert himself received. (*Id.* at 52–53.)

Kevin Phelan, too, testified that Price "showed favoritism" toward "one group of employees at UPS over another group of employees," but he was unable to say that the favoritism was based on race. (Phelan Dep. 15; *see id.* ("There's always [employees who] seem to have the boss's ear more than others. . . . I think the bosses have a go-to person or go-to people that have more attention maybe from management than others.").) He nonetheless agreed that he witnessed

Price "show[] favoritism toward white employees" "a time or two." (*Id.* at 16.) As an example of this, Phelan referenced the changing shift start times for the "parts man," meaning Sesson, and he explained that it seemed to him that there "was always something that they disliked about [Sesson] and . . . maybe that's personal or racial or whatever it may be. They had issues with [Sesson]." (*Id.* at 16–17.) He never heard Price using racial slurs or saying anything "against black employees," but his perception was that Price "didn't really like" Sesson, principally because Sesson would not "put up with any kind of crap from anybody . . . . H[e]'s pretty strong about his opinions." (*Id.* at 21, 23.) Phelan testified that it "appeared" to him that Price was a racist, but he could not point to anything specific to substantiate that opinion. (*Id.* at 23.)

Like Phelan, Phillip Gallucci observed Price as being more favorably disposed toward "[c]ertain groups of people," but he could not say that Price's favoritism was based on race. (Gallucci Dep. 16–17.) He then stated that the groups of people to whom Price showed favoritism were White, and he never saw favoritism toward Black employees. (*Id.* at 17.) By "favoritism," Gallucci meant that Price "[j]ust . . . constantly allow[ed] them to stand around or eat or pretty much do whatever" but did not allow "other employees to do the same." (*Id.* at 18.) He witnessed this type of "favoritism" "maybe" "five or six times." (*Id.*) But he would "get[] onto" Black employees for conduct that was unimportant and that everyone did. (*Id.* at 19.) Gallucci believed that Price was "racist" because of the way he was constantly "picking on" Sesson. (*Id.* at 23.)

## III. DISCUSSION

The FAC sets forth three counts containing four claims. Count I states claims for both race discrimination and hostile work environment/racial harassment in violation of Title VII. Counts II and III state two separate claims of retaliation in violation of Title VII. UPS seeks summary judgment on each of these claims.

A.     **Race Discrimination**

1.     *Title VII Standards*

Title VII provides that an employer may not "discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where, as here, the plaintiff relies on circumstantial evidence to prove his discrimination claim, courts apply the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first make out a *prima facie* case of discrimination, which requires the plaintiff to show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) similarly situated non-protected employees were treated more favorably than he was. *Stewart v. Esper*, 815 F. App'x 8, 16 (6th Cir. 2020) (citing *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016)).

An adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." *Id.* (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)) (ellipsis in original). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Generally, an action may qualify as a materially adverse employment action if, viewed objectively, it was "objectively intolerable to a reasonable person." *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002).

Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Should

the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (internal quotation marks and citations omitted). To make the requisite showing, the plaintiff must present sufficient evidence that a jury could find both that the defendant's reasons were not its true reasons and that they were, instead, a pretext for discrimination. *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 661 (6th Cir. 2020).

### 2. The Plaintiff's Allegations of Adverse Employment Actions

The FAC identifies under Count I only one specific adverse employment action upon which the discrimination claim is based: the plaintiff's "loss" of workers' compensation benefits. (FAC ¶ 49.) UPS points to the undisputed evidence that the plaintiff did not "lose" his workers' compensation benefits; there was simply a delay in their disbursal. In addition, it is undisputed that UPS's workers' compensation program and benefits were administered by a third-party insurance company, Liberty Mutual, and UPS was not responsible for the delay in the payment of benefits. UPS argues that, as a result, even if the delay in payment could qualify as a "materially adverse change in the terms or conditions" of Sesson's employment, the delay was not caused by, or "because of," UPS's conduct. (*See* Doc. No. 64, at 8 (quoting *Mitchell*, 389 F.3d at 182).) UPS also argues that, insofar as the discrimination claim is based on UPS's response to Sesson's complaints—as opposed to Phelan's complaints—about Satler's blocking the doorway, that action does not qualify as an adverse employment action for purposes of the plaintiff's discrimination claim. (*Id.* at 9.)

In his Response to the Motion for Summary Judgment, Sesson effectively concedes that UPS's response to his complaints about Satler is not an adverse employment action. He argues instead that he has stated a *prima facie* case of disparate treatment based on the prohibition on

performing overtime work in the Parts Department.[8] He asserts that he has shown that he "was denied overtime and lost income" due to this discriminatory treatment and has presented evidence that "other Caucasian mechanics were allowed overtime during the same period that Mr. Sesson was precluded from receiving the overtime benefits." (Doc. No. 69, at 8 (citing Sesson Dep. 85; Gallucci Dep. 30, 34, 35).)

In its Reply, UPS points out that the FAC only mentions the denial of overtime pay as an "adverse employment action" in the context of one of the plaintiff's retaliation claims. (*See* Doc. No. 43 ¶ 57 ("Plaintiff was subjected to an adverse employment action, including but not limited to, increased work load, a loss of overtime pay and loss of interest on the money he was to receive for workers' compensation benefits based on the retaliation in violation of Title VII[.]").) UPS argues that, as a result, the plaintiff did not properly plead discrimination based on the denial of overtime and that the plaintiff "may not expand [his] claims to assert new theories in response to summary judgment[.]"(Doc. No. 72, at 3 (quoting *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013)).)

Indeed, the Sixth Circuit has recognized that, generally, "the liberal pleading standards under [*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002),] and [the Federal Rules] are inapplicable" at the summary judgment stage and that a "plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion." *Tucker v. Union*

---

[8] The plaintiff does not contend that the changing start shift times constitutes an adverse employment action. The court observes that the Sixth Circuit has held that an "inconvenience resulting from a less favorable schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged." *Spees v. James Marine, Inc.*, 617 F.3d 380, 392 (6th Cir. 2010). In this case, however, Sesson has not actually offered any evidence that the changing schedule was less favorable or resulted in any inconvenience to him, as a result of which he likely would not be able to establish that the scheduling changes actually amount to an adverse employment action. *Accord Blackburn v. Shelby Cty.*, 770 F. Supp. 2d 896, 923 (W.D. Tenn. 2011).

*of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (citations omitted). At the same time, however, the Sixth Circuit has also recognized that, in construing a complaint, courts should "not rely on labels . . . but . . . probe deeper and examine the substance of the complaint." *Id.* (quoting *Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2001)).

In this case, Count I of the FAC expressly "incorporates by reference" the preceding factual allegations in the pleading. Although only workers' compensation is expressly referenced as an adverse employment action under Count I, the factual allegations clearly allege that the plaintiff was told in November 2018 that he could no longer receive overtime pay in the Parts Department and also alleges that, in being deprived of overtime, the plaintiff was treated disparately from "similarly situated Caucasian employees" who "continued to receive overtime pay" that he was denied. (FAC ¶¶ 31, 32.) Thus, the FAC asserts race discrimination based on disparate treatment as a theory of recovery, and it also pleads as a fact supporting that claim Sesson's being deprived of the opportunity to work overtime in the Parts Department. In addition, the FAC references Sesson's being deprived of the opportunity to work overtime as an adverse employment action in the context of his retaliation claim. That he referenced it as both an adverse employment action for purposes of retaliation and as an example of disparate treatment was clearly sufficient to put the defendant on notice that the plaintiff would rely on the overtime work issue as a basis for his Title VII discrimination claim. It is not a new theory of recovery, and it was not raised for the first time in response to the defendant's Motion for Summary Judgment.

UPS's failure to argue, in the context of the discrimination claim (or in the context of the retaliation claim), that the plaintiff cannot show that the denial of overtime was actually an adverse

action or that the plaintiff's proposed comparators are not actually similarly situated is perplexing.[9] Regardless, it means that the court must accept, for purposes of the defendant's Motion for Summary Judgment, that Sesson has stated a *prima facie* claim of discrimination based on the denial of the opportunity to work overtime in the Parts Department. However, in the context of addressing the retaliation claim expressly premised, in part, on the denial of overtime, UPS argues that it has presented a legitimate reason for its action and that Sesson cannot rebut it. UPS points to a general, districtwide prohibition on overtime on strictly parts work in order to cut costs. (*See* Doc. No. 64-8, at 2 (Holmquest Nov. 27, 2018 email, stating "Parts people need to be 8 and out everyday."); *id.* at 4 (Dec. 5, 2018 email, stating "Please make sure this is very clear with all your techs. Absolutely ZERO overtime on parts."); *id.* at 5 ("Barry, We need to make sure no techs have overtime doing parts. Did you authorize Phillip to work overtime stocking parts? Let me know as I have to answer up for this.").)

In response, the plaintiff argues that he has created a material factual dispute as to whether that proffered reason was its real reason, pointing to the testimony of Phillip Gallucci, who testified that he and two other White employees, Rob Gilliam and Jimmy Hunt, were allowed to do overtime work in the Parts Department, even when Sesson was not. (*See* Gallucci Dep. 30 ("[T]hey wouldn't allow him to finish, whether it was checking the parts into the inventory or putting the parts up

---

[9] The plaintiff has neither adequately alleged nor presented evidence that his pay was reduced after he stopped being able to work overtime in the Parts Department, and he admits that he was able to work overtime if he was working as a mechanic on a brown truck, so it is unclear how the ban on overtime work in the Parts Department was actually an adverse employment action. Moreover, the evidence establishes that overtime work was prohibited for work charged to the Parts Department, but not overtime work outside that department. (Sesson Dep. 167.) The plaintiff has shown that some mechanics were allowed to do overtime work that involved parts, but it would appear that these employees were not similarly situated in all relevant respects, since they were employed as mechanics rather than in the parts position. The defendant does not raise these arguments, however.

into overtime. But they would instruct me to do it into overtime or during my normal day . . . ."); *id.* at 34–36 (testifying that Hunt and Gilliam also did overtime work that "would have . . . potentially taken away overtime work for Floyd Sesson"); *see also* Sesson Dep. 69 ("I was limited to eight hours in the parts department. There's no way I could do everything . . . in eight hours . . . . So whatever I left undone, the evening guys, for the mechanic or the package mechanics, they would have to complete it . . . .").) UPS argues in its Reply that the plaintiff cannot show that UPS's reason for denying him overtime was pretextual, as to do so would require evidence that, not only was UPS's reason false but that discrimination was "the real reason for the adverse action." (Doc. No. 72, at 9 (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)).

As set forth above, once an employee states a *prima facie* discrimination claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory explanation for its action(s). *Edgar*, 443 F.3d at 508. "This is *not* a burden to 'persuade the court that it was actually motivated by the proffered reasons.' The defendant only has to present 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.'" *Harris v. City of Akron*, 836 F. App'x 415, 419 (6th Cir. 2020) (quoting *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 258, 255–56 (1981)). Once the defendant satisfies this burden, it rebuts the presumption of discrimination raised by the *prima facie* case. *Id.* And, in this event, the burden shifts back to the plaintiff to show that the employer's explanation is pretext for discrimination. *Burdine*, 450 U.S. at 255. As indicated above, "[t]o demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515

(1993)). Generally, to show pretext, a plaintiff must produce "sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally discriminated against him." *Harris*, 836 F. App'x at 420 (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009)).

UPS has satisfied its burden of production: it sought to "cut costs drastically" and therefore issued a general directive that no overtime work in parts would be approved. (Doc. No. 64-8, at 2.) The plaintiff argues that, even if the proffered reason was not false, UPS did not actually enforce it against White employees. He points to evidence that a few other employees—all classified as mechanics—were permitted to work overtime in the Parts Department even while he was not. However, his evidence that a few co-workers employed as mechanics were allowed to do overtime work on what should have been parts work, possibly in violation of the directive (*see* Doc. No. 64-8, at 5), does not refute the fact that a general directive aimed at all overtime parts work was in fact issued. Holmquest's emails conclusively establish that the directive was not applicable solely to the plaintiff—the conclusory assertions of some of the plaintiff's witnesses to the contrary notwithstanding. Sesson has no evidence that UPS's proffered reason for denying him the opportunity to work overtime in his parts position was pretext for discrimination. This is particularly true in light of the fact, as referenced in Note 9, *supra*, that the plaintiff concedes that he was allowed to work overtime in a mechanic position, just not for the Parts Department.

The court, therefore, will grant the defendant's Motion for Summary Judgment on the plaintiff's Title VII discrimination claim that is premised upon allegations of disparate treatment related to the plaintiff's being deprived of the opportunity to work overtime.

### B.      Racial Harassment/Hostile Work Environment

To state a *prima facie* case of racial harassment/hostile work environment, Sesson must present proof that (1) he belongs to a protected class; (2) he was subject to unwelcome harassment;

(3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action. *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017). To establish the fourth element, Sesson must show that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Strickland v. City of Detroit*, 995 F.3d 495, 505 (6th Cir. 2021) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). To show that the work environment was both objectively and subjectively hostile, the plaintiff must show, not only that he personally perceived the work environment as hostile, "but that a reasonable person would have found it hostile or abusive as well." *Id.* The harassing conduct "cannot be viewed in isolation." *Id.* Rather, the court "must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive," including "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" *Id.* at 505–06 (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (alterations in original). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations omitted).

In assessing a hostile work environment claim, the court may consider incidents of harassment that were not directed at the plaintiff, but, "if the conduct that forms the basis of a plaintiff's hostile work environment claim is not directed at that plaintiff, that fact 'diminishes [its] severity.'" *Id.* at 506 (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 501 (6th Cir.

2009)). In addition, "comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile." *Id.* (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009)).

Some of the purportedly harassing conduct alleged in the FAC has evaporated upon exposure to discovery, including the allegations that Ronnie Price (1) required the plaintiff to undergo more frequent drug screening than other employees (because the plaintiff apparently concedes that the testing was random); (2) "frequently" locked the plaintiff out of his computer (Doc. No. 43 ¶ 27(c) and (d)) (because the plaintiff testified that this occurred one time); (3) only corrected Jay Satler's practice of blocking Sesson's work area after the plaintiff was injured and his colleague Kevin Phelan complained about the same problem (because the evidence shows that Phelan and Sesson complained together); and (4) ensured that Sesson's co-worker Ronnie Baltz received more favorable treatment in connection with disability leave and benefits (because the evidence establishes that Baltz was injured more severely and that third-party Liberty Mutual administered workers' compensation benefits).

Viewing the facts in the light most favorable to the plaintiff (even though the plaintiff fails to reference many of these events in support of his hostile work environment claim), the other harassing conduct that might support the claim includes Price's "making light" of the plaintiff's need for knee surgery in 2016; Price's changing the start times of what was known to be Sesson's customary work shift, beginning in late 2017; the plan to hire a different parts employee, Kyle Roehl, in January 2018; Price's staring at Sesson in a menacing and intimidating manner on a single occasion; Holmquest's depriving Sesson of the opportunity for overtime pay, beginning in late 2018; the plaintiff's receipt of three separate written disciplinary actions related to his refusing

training from Kam Sandstrom in November 2019; and the placement of a surveillance camera directly over Sesson's desk in the Parts Department in January 2020.

UPS argues here that Sesson cannot make out a *prima facie* case, because (1) there is no evidence that the allegedly harassing conduct was "based on race," and (2) the harassing conduct of which Sesson complains was not objectively sufficiently severe or pervasive to "alter the terms and conditions" of his employment. (Doc. No. 64, at 13–14.)[10] The plaintiff disputes these arguments, pointing to Fred Summers' testimony that Ronnie Price gave "special privilege" to White employees in the shop, his example of which was Price's allowing White mechanics to send certain difficult or complex jobs out for repair but requiring Summers to do that type of work himself. The plaintiff argues that incidents of harassment not directed at him may be taken into consideration, but he does not claim to have had any knowledge of the type of "preferential treatment" to which Summers refers. He also cites his co-workers' testimony of their perception that Price was biased and disciplined Black employees differently from White employees.[11]

The court finds, first, that there is insufficient evidence to establish that the supposedly harassing treatment was based on race. The plaintiff's co-workers' testimony that they believed Ronnie Price was biased against Sesson based on his race is purely subjective and speculative. There is no evidence that Price (or anyone else at UPS) used racial epithets or racially derogatory comments. The court recognizes that "[c]onduct that is not explicitly race-based may be illegally

---

[10] UPS also argues that the harassment claim should be dismissed because Sesson failed to utilize UPS's internal complaint procedure and because he failed to exhaust administrative remedies with respect to some of the allegedly harassing conduct.. UPS has not presented sufficient evidence of its supposedly required internal complaint procedure to support the first argument, and the latter argument is stated in a wholly conclusory fashion and largely pertains to allegations that are no longer at issue.

[11] The plaintiff also points to Phelan's testimony that Jay Satler had a Confederate flag sticker on his toolbox at some point. The plaintiff does not claim to have seen the sticker or been aware of it, however.

race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). In *Clay*, for example, the Sixth Circuit found that the plaintiff presented a *prima facie* hostile work environment case where she was able to point to specific conduct for which she was criticized while her white colleagues were not, including standing around and eating a doughnut instead of working, "the route she took to get to her work station, for leaving her work station to get a cup of coffee," "using the bathroom at the end of her break," and "the size of her earrings." *Id.* at 707. But no such specific examples are presented in this case. Steve Calvert testified that Price disciplined Black employees for things that would "just be ignored" when White employees engaged in the same conduct, but Calvert did not provide a concrete example. (Calvert Dep. 15–16.) Similarly, Kevin Phelan claimed that he had seen Price "show[] favoritism toward white employees" "a time or two" (Phelan Dep. 16), but the only example he was able to give was the changing of the start times for Sesson's shift in the Parts Department. And Phillip Gallucci also believed that Price showed favoritism toward White employees, but he did not provide specific examples. He believed that Price was racist simply because he was constantly "picking on" Sesson. (Gallucci Dep. 23.)

These examples are simply too vague and speculative to persuade a jury that any harassment Sesson received was because of his race. *Accord Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) ("[R]umors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law."); *Okojie v. Metro. Nashville Hosp. Auth.*, No. 3:19-CV-00654, 2022 WL 389914, at *8 (M.D. Tenn. Feb. 8, 2022) ("Plaintiff's perception (a perception which appears to be based solely on Plaintiff's race being

different than the other employees' race(s)) that it was race that motivated these events by itself is not sufficient to show that the other employees' actions were based on race." (collecting cases)).

Moreover, the actual events to which the plaintiff himself points do not appear to be racially motivated. UPS offers business reasons for the changing start times for the parts position, the plan to hire Kyle Roehl, and the prohibition on overtime for parts work. The plaintiff's own testimony establishes a legitimate basis for written discipline in connection with his interactions with Kam Sandstrom, the trainer, even if the plaintiff also had a legitimate basis for refusing the training. And the plaintiff may have objected to the placement of another surveillance camera in the Parts Department, but there is no evidence regarding who actually made the decision to place the camera there or that the decision had anything to do with the plaintiff's race.

Even if the plaintiff had evidence that any of this conduct was race-based, it was not objectively sufficiently severe and pervasive to create a hostile work environment. Virtually all of the conduct to which the plaintiff points involved isolated events that took place over the course of several years, and there is no evidence that these events, individually or collectively, were sufficiently harassing that they affected the terms and conditions of the plaintiff's employment or his ability to do his job. [12] The plaintiff did not experience any physically threatening or humiliating behavior, nor did he witness offensive utterances. As noted above, "isolated incidents" do not constitute a hostile environment under Title VII. *Faragher*, 524 U.S. at 788 (internal citation omitted). Moreover, the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citation omitted). The proper application of Title VII to employment claims is meant to "filter out complaints

---

[12] For instance, the plaintiff does not claim that he was disciplined in any way for failing to complete any of his job duties within the allotted eight hours.

attacking 'the ordinary tribulations of the workplace.'" *Id.* And the Supreme Court has "made it clear that conduct must be *extreme* to amount to a change in the terms and conditions of employment." *Id.* (emphasis added).

The evidence in this case, viewed in its totality, does not establish that the plaintiff's work environment was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Strickland*, 995 F.3d at 505. The defendant is entitled to summary judgment on this claim.

## C.      Retaliation – Count II

A Title VII retaliation claim, too, is subject to the "familiar *McDonnell Douglas* burden-shifting framework." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). To state a *prima facie* case of retaliation, the plaintiff must show that "(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). If the plaintiff succeeds in presenting sufficient evidence to establish a *prima facie* case of retaliation, the burden then shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its action. *Kenney*, 965 F.3d at 448 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer does so, "the burden of production shifts back to [the plaintiff] to demonstrate that [the defendant's proffered reason was a mere pretext for discrimination." *Id.*

In Count II of the FAC, the first of the two retaliation claims, the plaintiff asserts that he engaged in protected conduct when he "reported and/or objected about the incidents which he

reasonably believed were the result of racial discrimination to management officials at UPS" and that he experienced retaliation as a result of such report and/or objection when UPS withheld workers' compensation benefits. (Doc. No. 43 ¶¶ 54–55.) He also alleges that he suffered adverse employment actions, including "increased work load, a loss of overtime pay and loss of interest" on the delayed workers' compensation payments. (*Id.* ¶ 56.)

UPS argues that it is entitled to judgment in its favor on this claim, because: (1) insofar as the plaintiff claims that he suffered retaliation because he complained about Jay Satler's conduct in September 2016, that complaint did not constitute "protected activity" under Title VII; (2) there is no dispute that the delay in the scheduling of the plaintiff's knee replacement surgery and the delay in the plaintiff's receipt of workers' compensation benefits are not attributable to UPS; (3) an increase in job responsibilities does not constitute an adverse employment action for purposes of a retaliation claim; and (4) even if the deprivation of overtime pay for the parts position constitutes an adverse employment action for purposes of a retaliation claim, the plaintiff cannot establish a causal connection between that action and any protected conduct. As discussed above, UPS also argues that it has articulated a legitimate, non-discriminatory reason for the prohibition on overtime pay for the parts position and that the plaintiff cannot rebut that reason.

In response, the plaintiff abandons any attempt to rest his retaliation claim on issues with his receipt of workers' compensation benefits and medical treatment or on an increased workload. He also disclaims any intention to base the claim on his complaints to management about Jay Satler. He contends that (1) he filed his first charge of discrimination with the THRC on October 25, 2017 and his second on or about November 27, 2018 and that both of these actions qualify as protected activity; (2) the denial of overtime pay qualifies as an adverse employment action for purposes of a Title VII retaliation claim; and (3) there is a sufficiently close temporal proximity

between the protected activity and adverse action to give rise to an inference of causality sufficient to establish his *prima facie* case. He also argues that he has presented evidence to show that the defendant's proffered legitimate reason for the prohibition on overtime pay was not true or, at a minimum, to show that the rule was not followed "as to some of the white employees in the shop." (Doc. No. 69, at 18.) In its Reply, UPS argues that the "year-plus gap" between Sesson's October 2017 THRC complaint and the November 2018 directive regarding overtime pay for parts work is insufficient to give rise to an inference of causation, and the November 2018 THRC complaint was filed *after* the decision relating to the denial of overtime work and, therefore, cannot have caused it.

The court finds both that the plaintiff cannot establish a causal connection between his protected activity and the alleged adverse action, for purposes of his *prima facie* case, and that, as already discussed above, he lacks evidence sufficient to establish that the proffered legitimate, non-retaliatory reason for the overtime pay directive is pretextual.

       *1.    Causal Connection*

In the Sixth Circuit, when "an adverse employment action occurs *very close in time* after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (emphasis added). If, however, any significant period of time passes "between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001) (finding that "temporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection)).

In his Response to the Motion for Summary Judgment, the plaintiff continues to attempt to hang his retaliation claim on the November 27, 2018 THRC charge and union grievances filed in December 2018, but he does not dispute that the directive that he not work overtime in parts occurred earlier in November, before he filed the THRC charge or the union grievances. The plaintiff fails to explain how he can show a causal connection between protected activity and an adverse action that took place *before* the protected activity.

And the amount of time here between the filing of the plaintiff's October 2017 THRC charge and the adverse action Sesson complains about—thirteen months—is not "very close" in time and certainly not sufficiently close, standing alone, to create an inference that there is a causal connection between them. *See* C*ooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation."), *quoted in Mickey*, 516 F.3d at 524. Implicitly recognizing that the thirteen months that lapsed between the filing of his October 2017 THRC charge and the November 2018 directive not to work overtime in parts is insufficiently close to give rise to an inference of a causal connection, the plaintiff argues that "there is still a sufficient causal connection because of the level of harassment that Mr. Sesson was required to endure in 2017 and 2018." (Doc. No. 69, at 16–17.) The plaintiff makes no attempt to specify what harassing conduct he endured between October 2017 and November 2018, however. As set forth above, the plaintiff has not shown that he was actually subjected to a hostile work environment. Moreover, any possible inference of a causal connection is further weakened by the fact that the plaintiff's complaints about a hostile work environment during that timeframe all involve Ronnie Price, but Price was fired in September 2018, and it was Holmquest, his successor, who told the

plaintiff that he could no longer work overtime in parts (based on a directive issued by his supervisor, Chris Crawford).

The court finds that the plaintiff fails to establish a causal connection between his engaging in protected conduct and the overtime directive, for purposes of establishing a *prima facie* case of retaliation in violation of Title VII.

### 2. Pretext

Even if the plaintiff could establish a *prima facie* case of retaliation as alleged in Count II of the FAC, the court further finds that he cannot show that UPS's proffered reason for its action is pretextual, for the same reasons as discussed above in connection with the plaintiff's discrimination claim based on the same overtime issue.

For this reason as well, the defendant is entitled to summary judgment on Count II of the FAC.

### D. Retaliation – Count III

In Count III of the FAC, Sesson asserts a claim of retaliation based on the three written disciplinary actions issued on November 4, 2019 and the installation of the surveillance camera above his work station in January 2020. (Doc. No. 43 ¶¶ 63, 64.) In his Response to the Motion for Summary Judgment, the plaintiff expressly "concedes the retaliation claim as it relates to the placement of the security camera over his desk." (Doc. No. 69, at 19 n.3.)

UPS interprets the FAC as alleging that the three written disciplinary actions were issued in retaliation for the filing of the May 2017 EEOC complaint.[13] This is because the plaintiff alleges in the fact section of the FAC: "Subsequent to Plaintiff filing a charge of discrimination with the

---

[13] It also argues that the three written disciplines cannot have been based on the filing of this lawsuit, which took place later. The plaintiff does not dispute that argument.

THRC and/or EEOC on or about May 16,2017, he was subjected to continued harassment and certain adverse employment actions by UPS." (Doc. No. 43 ¶ 33.) And then, in the next paragraph, he alleges: "On or about November 4, 2019, Plaintiff received three separate written disciplinary actions which included language that UPS intended to suspend and/or discharge him from employment." (*Id.* ¶ 34.) Elsewhere in the FAC, however, the plaintiff enumerates the dates of all of his EEOC and THRC filings, and, within Count III, he does not attribute the written discipline to any one of his specific EEOC or THRC complaints, alleging instead: "Plaintiff reported and/or objected about the incidents to federal and/or state agencies which he reasonably believed were the result of racial discrimination by management officials at UPS." (*Id.* ¶ 62.) The court finds that the plaintiff adequately pleaded retaliation based on the filing of all of the various EEOC and THRC charges that preceded the issuance of the written discipline.

In any event, UPS argues in its motion that the plaintiff cannot establish a claim of Title VII retaliation premised upon the three written disciplinary actions, because: (1) the plaintiff cannot establish a causal connection between the May 2017 EEOC charge and the November 2019 discipline; and (2) the plaintiff cannot meet his burden of establishing that UPS's legitimate, non-retaliatory reason for issuing the disciplinary actions was pretext for retaliation. In response, Sesson argues that the temporal proximity at issue is not thirty months, as "suggested by the Defendant, but slightly more than eleven months," based on the filing of the THRC charge on November 27, 2018. (Doc. No. 69, at 20 & n.4.) He argues that this eleven-month timeframe "is sufficient proximity based on the level of harassment heaped on Mr. Sesson in 2018 and 2019." (*Id.* at 20.) He also argues that he can establish that the defendant's proffered reason for the written discipline is pretext, based on his having presented evidence that his refusal of the training offered by Sandstrom was justified because the training offered nothing new.

In its Reply, UPS, again, contends that the FAC "solely pleads that [the] November 2019 discipline was in retaliation for [Sesson's] May 2017 EEOC complaint" and that plaintiff cannot amend his pleading at this juncture to claim that the November 2019 discipline was in retaliation for the November 2018 THRC complaint. (Doc. No. 72, at 9.) Alternatively, UPS argues that the eleven-month gap is also insufficiently close in time to give rise to an inference of a causal connection, again because the plaintiff has not shown that his workplace was "permeated with retaliatory harassment" during the elapsed time. (*Id.* at 10.) Finally, it also argues that the plaintiff's attempt to dispute its legitimate reason for the discipline falls short, because his arguments are "nothing more than a 'disputation of the facts underlying [UPS's] legitimate business reason,' which [the Sixth Circuit] has recognized is 'not sufficient to carry [Plaintiff's] burden.'" (Doc. No. 72, at 10 (quoting *Fitzpatrick v. Henderson*, 55 F. App'x 248, 252 (6th Cir. 2002)).)

As noted above, the court rejects the defendant's argument that the plaintiff did not adequately plead the November 2018 THRC complaint as the basis for his retaliation claim. The court nonetheless also finds that the plaintiff does not allege retaliatory harassment as a basis for the retaliation claim in Count III—he alleges that he suffered an adverse employment action in the form of the issuance of the written discipline in retaliation for engaging in protected activity. Even if he had asserted a claim of retaliatory harassment, the factual allegations in the FAC and the evidence in the record do not support such a claim. The only adverse or harassing events about which the plaintiff complains that appear to have taken place after the filing of the November 2018 THRC complaint are the November 2019 disciplinary actions. And the eleven-month period that passed between that protected activity and the written discipline, standing alone, is not sufficiently short to give rise to an inference of causation, as discussed above. The court finds, therefore, that

the plaintiff cannot establish a *prima facie* case of retaliation based on the issuance of the written discipline.

Moreover, the defendant has proffered a legitimate reason for the written discipline. It is not improper to discipline an employee who refuses training, is insubordinate, and leaves the workplace without authorization, regardless of whether the employee thinks he needs the training. Sesson has not rebutted UPS's proffered reason for the written discipline; he simply points out that the training did not offer him anything new. That fact, however, does not establish that the defendant's reason is pretext. The defendant is entitled to summary judgment on this basis as well.

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant UPS's Motion for Summary Judgment. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge